******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOHNNY MARTINEZ
(AC 38788)

DiPentima, C. J., and Keller and Calmar, Js.

*Argued October 18, 2016—officially released March 28, 2017*

(Appeal from Superior Court, judicial district of
Waterbury, Crawford, J.)

*Steven B. Rasile*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Cynthia S. Serafini* and *Terence Mariani*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Johnny Martinez, appeals from the judgment of conviction rendered by the trial court, following a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a), and tampering with evidence in violation of General Statutes (Rev. to 2010) § 53a-155 (a) (1).[1] The defendant claims that the court (1) violated his right to present a defense by prohibiting him from presenting evidence concerning an altercation that took place in the hours prior to the events at issue, (2) violated his right to cross-examination by limiting the scope of his cross-examination of a state's witness, (3) improperly instructed the jury with respect to accessorial liability in the course of its instructions concerning the murder count, (4) improperly failed to comply with the jury's request to have certain testimony played back, and (5) improperly denied his request to suppress a written statement that he provided to the police. We dismiss the appeal with respect to the third claim, and with respect to the remainder of the appeal, we affirm the judgment of the trial court.

On the basis of the evidence presented at trial,[2] the jury reasonably could have found the following facts. Shortly after 4 a.m., on November 2, 2010, the victim, Arnaldo Gonzalez, left his residence on Savings Street in Waterbury and began walking to an election polling station on Washington Street, where he was scheduled to report at 5 a.m. to work as a bilingual interpreter. When the victim left his residence, he was carrying a black backpack.

The victim made his way to Baldwin Street when an automobile being driven by Manuel Vasquez, and in which the defendant, Michael Mark,[3] and Anthony Garcia were passengers, drove by him. The four men in the automobile were on their way to purchase liquor at a "bootleg house" at which liquor was sold "after hours," when bars and package stores were not open for business. Mark observed the victim and commented aloud that he intended to rob him.[4]

Vasquez parked the automobile along Baldwin Street, near the bootleg house. Before going to purchase liquor, Vasquez cautioned Mark not to do anything "stupid." The defendant and Mark then exited the automobile and proceeded on foot in the victim's direction. Garcia remained in the automobile.

The defendant and Mark followed the victim intending to rob him. As they got closer to the victim, Mark picked up a hard object, perhaps a brick or a rock, from the ground. Mark ran toward the victim from

behind while the defendant ran into the street to prevent the victim from fleeing from them. Mark struck the victim in the back of the head with the hard object. The victim did not have time to react, but immediately fell to the ground. Mark repeatedly struck the victim, who was lying face down on the ground. When the defendant, wearing white sneakers, came upon the victim, he stomped on the victim's head, causing blood to transfer onto one of his sneakers. Mark left the victim while in possession of the victim's backpack.

When Vasquez returned to the automobile a short time later, Garcia informed him that he thought that the defendant and Mark had gone "up the street" to "rob" the victim. Vasquez drove a short distance before he observed the defendant and Mark running in a southerly direction, on opposite sides of the street, near the intersection of Baldwin and Galivan Streets. Vasquez stopped the automobile to permit both men to get inside of it. Mark remained in possession of the victim's backpack. Mark was "bugging out," looking at his hands, and he stated three times that he had killed the victim. The defendant stated that Mark had hit the victim " 'in the head over and over again.' " Also, the defendant stated that he had kicked the victim. The victim, who sustained multiple skull fractures and brain hemorrhaging, died as a result of blunt force trauma to his head that was consistent with being hit with a hard object such as a rock and being kicked with a shod foot.

Vasquez drove the men to the defendant's residence on Second Avenue. There, in the kitchen, Mark referred to the manner in which he had struck the victim in the head; he imitated the cracking sound that he had heard during his assault of the victim.[5] The defendant and Garcia rummaged through the items in the victim's backpack, which included several items that the victim, a diabetic, used to care for himself. The commotion caused the defendant's sister-in-law, Joan Ruiz, to come to the kitchen. Ruiz asked the defendant about the appearance of blood on one of his sneakers, to which the defendant replied that they had "jumped a crackhead" who owed them money and that he had "kicked him in the head." Later, after Ruiz learned from the defendant that Mark had killed someone, Ruiz told everyone to leave and to remove the victim's backpack from her residence.

After Ruiz observed the blood on the defendant's sneaker, he went to a bathroom and cleaned the blood off of the sneaker. The defendant concealed the backpack by tossing it on the roof of a neighbor's garage. In the hours following the murder, the defendant appeared to be crying and he stated that "he couldn't believe that he kicked the guy."

Additional facts will be set forth as necessary.

I

First, the defendant claims that the court violated his right to present a defense by prohibiting him from presenting evidence concerning an altercation that took place in the hours prior to the events at issue. Although we agree that the court erroneously ruled as it did, we conclude that the error was harmless beyond a reasonable doubt.

The following procedural history provides necessary context for our analysis of the defendant's claim. At trial, the state presented evidence that, following the victim's murder, blood was present on one of the defendant's sneakers. The defense attempted to demonstrate that the blood was not the victim's blood, but that it was the blood of a third party with whom the defendant had been involved in a physical altercation in the hours prior to the victim's murder.

During his direct examination by the state at trial, Garcia testified that, when he, the defendant, Vasquez, and Mark were at the residence on Second Avenue following the victim's murder, he observed blood on one of the defendant's sneakers. He recalled that, after Ruiz asked the defendant why there was blood on his sneaker, the defendant "went to clean it." During the defense's cross-examination of Garcia, he was asked about an event that occurred while he was with the defendant, Vasquez, and Mark, in the hours prior to the victim's murder. The state objected to this inquiry and, outside of the presence of the jury, the state argued that it appeared that the defense was attempting to elicit testimony concerning an event "where the four individuals . . . got into a fight or a scuffle with somebody, that there was a dispute over the purchase of either powdered or crack cocaine. That was where [defense counsel] was trying to get with this particular witness."[6] The state argued that the inquiry was objectionable on the grounds that it was beyond the scope of the state's direct examination of Garcia and because the evidence was not relevant to the events that transpired on Baldwin Street and resulted in the victim's death.

Defense counsel argued that the line of inquiry was proper. First, he argued that the evidence was within the scope of the state's direct examination because the state had elicited testimony from Garcia with respect to events that transpired when the four men (the defendant, Vasquez, Garcia, and Mark) "got together" in the hours prior to the murder. Second, the defendant's attorney argued that the evidence he was trying to elicit would tend to demonstrate that, in the hours prior to the murder, the defendant had kicked a third party (a person he referred to as a "crackhead"). He argued that this evidence was "absolutely relevant" and "material to the defense of the case" because it tended to demonstrate that the blood on the defendant's sneaker was not caused by his conduct with respect to the victim

in this case but that it resulted from the defendant's violent conduct in an unrelated incident. The defendant's attorney told the court that the evidence was relevant to demonstrate "[t]hat the [prior] incident occurred and whether or not [Garcia] knows if the blood [on the defendant's sneaker] came from that incident, as opposed to a later incident."

The court sustained the state's objection in part. The court ruled that the defense could inquire of Garcia as to whether he knew the source of the blood on the defendant's sneaker but that "[a]ny details as to any encounter concerning a crackhead, or however the person was referred to, those details are not essential to determining whether or not he knew the source of the blood on the shoe. Since what is relevant appears to be . . . that he saw the defendant washing blood off of his shoe, you may inquire as to whether he knew about the source of that blood on his shoe. . . . [T]he details concerning the prior encounter, that is not allowed. . . . [Y]ou can inquire as to whether or not he was present at a previous encounter and whether or not he knows of . . . that encounter being the source of the blood." The court went on to explain: "The details as to the encounter, as in there was somebody talking about going to take something from a crackhead and what they took and didn't take, what is relevant to this is . . . the source of the blood on the defendant's shoe. . . . You may inquire as to what he knows concerning the source of the blood, and that can be done without the details of the encounter." The court stated: "Here's the question[s] that you will be permitted to ask. Was there a prior altercation involving the four individuals in the car? How long did that happen before the encounter with [the victim]? And whether he saw any blood on the defendant's shoes from that altercation."

After the court's ruling, the following colloquy occurred between defense counsel and Garcia:

"Q. [D]id an incident occur in the late evening hours of November 1, or the early morning hours of November 2, 2010, where you, [Vasquez, Mark, and the defendant] had an altercation with a third party, not [the victim]?

"A. Yes.

"Q. Okay. Do you recall approximately how long from that incident until you went to the bootlegger store, approximately how long was that time frame?

"A. It was a big time frame . . . probably like around four hours, three, four hours.

"Q. As a result of that altercation do you know whether or not that was the source of the blood on [the defendant's] shoes that you saw at Second Avenue?

"A. It could have been, but I don't know."

During Garcia's continued cross-examination by

defense counsel, the following colloquy occurred:

"Q. [On Second Avenue] [s]omeone asked [the defendant] about where the blood came from, didn't they?

"A. Yes.

"Q. And [the defendant] gave an answer to that, didn't he?

"A. Yes.

"Q. [He] said he kicked a crackhead, isn't that true?

"A. True.

"Q. [The defendant] said he kicked a crackhead in the head, correct?

"A. True.

"Q. At the time that statement was made do you know whether or not [the victim] was a crackhead?

"A. No.

"Q. Do you have any reason to believe that he was a drug user that evening?

"A. No."

Following Garcia's testimony and outside of the presence of the jury, defense counsel renewed his argument that the court should have permitted him greater leeway to develop a factual basis concerning the prior physical altercation involving the defendant and the third party. The court, observing that its ruling would apply to the defense's examination of other witnesses, responded by stating in relevant part: "The details as to that incident are irrelevant. I allowed what the court deemed to be relevant: that there was an earlier incident, that there was an altercation, that they were involved. You were allowed to address your claim concerning whether or not there was blood because there was a question concerning . . . the defendant washing blood off of his shoes." The court further explained: "The fact that there was something earlier, I've allowed. The time frame between that and the incident involving [the victim] is allowed. And any questioning concerning any blood from that incident versus any blood from the later incident is allowed. The details that had been put before the court on the record concerning who they saw, what they did to him, who did what, I'm not going to allow the details. Who owed what for drugs or who owed money. I have ruled that portion of that incident is not admissible." The court then stated: "One of the big problems is, the details concerning that [prior] incident are likely to be confusing and create other problems. But what I have ruled is relevant is that there was an incident, that they were involved. There seems to have been some altercation and you're permitted to question concerning whether or not there was blood from that incident to explain the blood that [the defendant] was seen washing off [his sneaker]."

The court had occasion to revisit its evidentiary ruling during the testimony of Sonia Hernandez, who had observed the victim's lifeless body on Baldwin Street. See footnote 5 of this opinion. During her direct examination by the state, Hernandez testified that in the early morning of November 2, 2010, she was in a car with Vasquez and Mark. As the car traveled down Baldwin Street, Hernandez observed a male lying on the sidewalk, as well as blood. Hernandez stated that when she brought this to Mark's attention, he stated " '[t]hat he was just a crackhead. He deserved that. He owed [me] money or something.' " Hernandez testified that Mark then exited the automobile in the vicinity of the person lying on the sidewalk and stated that he had to hide a brick. Following this testimony, defense counsel argued that Hernandez' testimony, viewed in conjunction with Garcia's testimony, gave rise to an inference that the defendant had kicked the victim. Thus, defense counsel argued, the court should permit the defense to elicit additional details with respect to the prior incident to rebut this inference. Specifically, defense counsel argued that the state had presented evidence that tended to demonstrate that the victim in the present case was the "crackhead" described by Garcia, but that the court's ruling unfairly precluded the defense from demonstrating that there was another "actual crackhead incident" that did not involve the victim. The court stated that Hernandez' testimony, in which she stated that Mark had referred to the victim as a "crackhead," did not cause it to change its ruling with respect to the parameters of defense counsel's inquiries. The court stated that its limitations did not preclude the defense from eliciting facts that tended to demonstrate that the blood on the defendant's sneaker came from the prior incident, not the incident on Baldwin Street involving the victim. The court added that the evidence that the defense sought to introduce had "a tendency to confuse the jurors in terms of the actual details of a different incident."

At trial, Vasquez testified with respect to the activities of November 2, 2010. He stated in relevant part that, when he returned to the automobile he was driving after he made a purchase at the "after hours" liquor store, he discovered only Garcia inside. Garcia told him that the defendant and Mark had gone "up the street." Vasquez testified that he drove south on Baldwin Street until he observed the defendant and Mark running. He stopped the automobile and both men got inside. Mark, in possession of a black backpack, was "bugging out," stating that he had "killed the guy." Vasquez testified that the defendant stated that he had "kicked him," or that he referred to the fact that he had kicked somebody. Vasquez stated that when he arrived at the residence on Second Avenue, he observed blood on the defendant's white Nike sneakers.

Also, Vasquez testified that "an incident" had occurred in the hours prior to the incident on Baldwin Street, prior to the time at which he went to the "after hours" house to purchase liquor. He stated that he, the defendant, Garcia, and Mark were present at that prior incident. During recross-examination by defense counsel, the following colloquy with Vasquez occurred:

"Q. [Y]ou testified on redirect [examination] regarding my client making some comment about kicking someone, is that correct?

"A. That's correct.

"Q. You have no knowledge who he was referring to, correct?

"A. Correct.

"Q. It could have been the individual in the earlier incident, is that correct?

"A. Correct."

Ruiz, who is the defendant's sister-in-law and Vasquez' sister, testified that she observed the defendant, Vasquez, Mark, and Garcia at her and the defendant's residence on Second Avenue in the early morning hours of November 2, 2010. When she heard them come inside the residence, she went downstairs and observed the defendant and Garcia looking inside of a black backpack. The following colloquy between the prosecutor and Ruiz occurred:

"Q. Did you notice anything on either Mr. Garcia or [the defendant]?

"A. I noticed blood.

"Q. On where?

"A. On [the defendant's] sneaker.

"Q. Do you remember which sneaker it was?

"A. No, I don't.

"Q. And can you describe it?

"A. On the side of the sneaker.

"Q. And what color was it?

"A. Red.

"Q. And did you inquire about that?

"A. Yeah.

"Q. What was the response that you got?

"A. That he had kicked a crackhead that owed them money.

"Q. Okay. And who said that?

"A. [The defendant].

"Q. [H]e said what exactly?

"A. That he had–they jumped a crackhead and he had kicked him in the head and that he owed them money."

Ruiz proceeded to testify that there was "a lot of blood" on the sneaker and that, following her comment to the defendant, she observed him remove his sneaker and clean it in a bathroom sink. Ruiz testified that she also spoke with Mark, who told her that, using a rock, he had killed a man. Specifically, Mark told Ruiz that "they had robbed a crackhead for the black backpack" and that this crime had transpired on Baldwin Street.

During cross-examination of Ruiz, defense counsel revisited the issue of the bloody sneaker, as reflected in the following colloquy:

"Q. Now, at some point you ask [the defendant] about something on his shoes, correct?

"A. Yes.

"Q. And he made a statement that you testified earlier, they jumped a crackhead and he kicked him in the head because he owed them money, is that correct?

"A. Yes.

"Q. Now, were you aware that earlier that evening, [Mark, Garcia, the defendant and Vasquez] were involved in another incident?

"A. No.

"Q. Did your brother [Vasquez] ever tell you that there was an incident that the four of them jumped someone else earlier that evening?

"A. No.

"Q. Did [Mark] ever tell you that the four of them jumped someone else earlier that evening?

"A. No.

"Q. Did [Garcia] tell you that the four of them jumped someone else earlier that evening?

"A. No.

"Q. Do you have any idea where the blood on those shoes came from?

"A. No, I don't.

"Q. Do you know whether or not it came from that other incident?

"A. No.

"Q. So your brother [Vasquez] never told you about this prior incident?

"A. No."

Once more, following Ruiz' testimony, defense counsel expressed dissatisfaction with the court's ruling that precluded inquiry with respect to the details of the prior incident. The defense paid particular attention to the

court's ruling that limited inquiry with respect to Garcia. Defense counsel's arguments arose in the context of the defense's motion for the court to issue a capias to compel the appearance of Garcia, who had been subpoenaed by the defense to testify, but did not appear. Specifically, during a lengthy exchange with the court, defense counsel argued that additional details were necessary in light of statements attributed to the defendant, in which he used the term "crackhead," and Ruiz' testimony that Mark appeared to have referred to the victim as "a crackhead." The court reaffirmed its prior ruling, stating that the defendant was permitted to present evidence, and had presented evidence, with respect to when the prior incident had occurred, who was present when it occurred, the fact that the prior incident included an altercation, and whether the witnesses knew if the blood seen on his sneaker was the result of that prior incident. The court stated that it would not permit the defense to elicit evidence with respect to the attributes of the victim of the prior incident (whether he was a "crackhead" or not) or with respect to the motive for that altercation because it did not view such details as being relevant to the issue of whether the blood on the defendant's shoe was the result of his conduct toward the victim on Baldwin Street.

The following day, the court heard further argument with respect to the defendant's motion for the court to issue a capias to compel Garcia's appearance. With respect to why the defense wished to compel Garcia to testify, defense counsel indicated that the defense wished to recall Garcia for the purpose of rebutting the inference, which could be drawn from the evidence presented thus far in the case, that the defendant's references to kicking a crackhead were to the victim. In a written offer of proof, the defense represented that it would present testimony from Garcia that, during the prior incident, Vasquez had attempted to sell crack to a male third party described as "a crackhead" or "[a] dopehead," the third party took possession of the crack and ran away, and that this led to "an altercation" involving the third party, Vasquez, Mark, Garcia, and the defendant. Additionally, the defense intended to present Garcia's testimony that he did not have any reason to believe that the victim in this case was a crackhead. Further, defense counsel indicated that it wished to present testimony of a similar nature from the defendant and Vasquez during its case-in-chief, and submitted an offer of proof in this regard that set forth details concerning the altercation with the third party in the prior incident. Once again, defense counsel argued that, to dispel any confusion with respect to the defendant's statements following the murder (about kicking a crackhead), it was imperative for the jury to hear the foregoing testimony that the third party in the prior incident, "the actual true source of the blood on [the defendant's] shoes," was a crackhead.

In a lengthy ruling, the court reiterated in substance its prior ruling with respect to the details of the prior incident. The court stated that the reasons as to why the prior incident occurred or why the defendant acted the way he did in the prior incident were not relevant to the issues before the jury. The court stated that "this is not the place to adjudicate whether or not that person [in the prior incident] was a crackhead." The court rejected the defendant's argument that its ruling infringed on his right to present a defense; the court noted that the defendant was permitted to present evidence that the altercation occurred, when it occurred, what he did during the altercation, and who was present at the altercation. The court observed, as well, that the defendant was free to testify with respect to what he actually stated following the murder and what he did during the altercation to explain the source of the blood that had been observed on his sneaker. The court observed that, although its earlier ruling had not precluded such inquiry, during cross-examination of prior state witnesses, the defense had not explored the issue of what the defendant did with respect to the third party in the prior incident by, for example, inquiring as to whether he had kicked the third party and whether he had blood on his shoes immediately following the prior incident. The court made clear that the defense had ample opportunity to demonstrate that the defendant was involved in a prior incident and that the third party involved in that incident was the source of the blood on his sneaker, not the victim. The court stated that such a theory of defense "has not been impeded in any way."

Subsequently, the defendant testified. With respect to his participation in the victim's murder generally, the defendant testified that he was in the automobile being driven by Vasquez, in which he, Garcia, and Mark were passengers, when Mark observed the victim and stated that he intended to rob him. He testified that, when Vasquez went into the "bootleg" house, Mark exited the automobile and that he followed him in an attempt to stop him.[7] He recalled that Mark proceeded in the victim's direction, he bent down and then got back up, and then he "took off like a rocket" toward the victim. He continued to follow Mark and then he heard "something hitting the ground hard." Before he and Mark got back into Vasquez' automobile, he observed a person lying on the ground. The defendant said that Mark stated that he thought he had " 'just killed that guy,' " and that he replied to Mark, "why'd you have to do that?"

The defendant testified that once the four men in his group arrived at the residence on Second Avenue, Ruiz asked him about his sneaker. He testified that he replied that "we just had . . . a fight [with] somebody up the block." He stated that, he was talking about "[t]he inci-

dent before we went to the bootleg spot, the individual there that we all . . . jumped basically." He stated that, in his comment to Ruiz, he was not referring to the victim. According to the defendant, he proceeded to clean the blood off of his sneakers in a bathroom.

During his redirect examination, defense counsel elicited testimony from the defendant with respect to the prior incident. The defendant testified that he, Vasquez, Mark, and Garcia were exiting the residence on Second Avenue and walking toward an automobile when Vasquez had a conversation with a third party. The defendant testified that he, Mark, and Garcia either were inside of the automobile or entering the automobile when Vasquez banged on a window and asked them to help him. The three men exited the automobile and, along with Vasquez, walked across Second Avenue and confronted this third party by physically striking him. The defendant testified that this occurred because the third party had "done something to" his cousin, Vasquez. The defendant said that the third party was "a good sized man," who was approximately two inches taller than him. He stated that he punched the third party in the face with "one quick jab," and then the third party ran into the street. He stated that his associates pursued the third party and, as they fought with him, the third party fought back. The defendant testified that using his right foot he kicked the third party in the face, by the area of his nose and mouth, causing bleeding, and that the blood subsequently observed on his sneaker resulted from that conduct. He stated that, when he saw blood on his sneakers, he stopped. The defendant stated that after that incident occurred, he, Vasquez, Mark, and Garcia "went back in the car and went to the bootleg spot." He stated that Vasquez used a certain route to drive to the bootleg house because, at that time, he was "riding around with drugs," specifically, crack cocaine.[8]

Following the verdict, the defendant filed a motion for a new trial. One of the grounds raised was that "[t]he verdict of guilty rendered by the jury was the result of the court's decision to limit the defendant's ability to elicit testimony regarding the true source of the blood on the defendant's sneakers and properly explain that the individual the defendant admitted to kicking was, indeed, a crackhead and not the alleged victim . . . ." In argument on the motion, defense counsel stated that the defense was unfairly precluded from demonstrating that the third party in the prior incident was a crackhead and that this was made prejudicial by the state's argument that the evidence of the defendant's statement that he kicked a crackhead referred to the victim. In denying the motion as to this ground, the court stated: "[T]here was testimony concerning the source of the blood. What the court had indicated . . . was that whether or not the individual in that first incident was a crackhead, that this was not

the place to adjudicate that. And whether or not he was a crackhead didn't matter. The fact is it was the jurors who were going to decide if they believed that the source of the blood on the shoe was from the first incident or from the second incident. They made their determination as to the source of the blood on the shoe. And the defendant did testify, and as a matter of fact, he also demonstrated how he kicked the individual in the first incident."

On appeal, the defendant claims that the court erroneously prohibited him from presenting evidence concerning the prior incident, specifically, evidence "that the prior incident victim was an identified and known crackhead . . . ."[9] As he did before the trial court, he argues that such evidence was relevant because it "made it more probable that [his] statement that he kicked a crackhead in the head was in reference to the prior incident and not, therefore, [the victim]." The defendant argues that "the probative value [of the evidence] was not outweighed by its prejudice, as it (1) would not unduly arouse the jury's emotions, hostility, or sympathy; (2) would not create a side issue that will unduly distract the jury from the main issues; (3) would not create or consume an undue amount of time; and (4) involved no issue of surprise to either side." Additionally, as he did before the trial court, the defendant asserts that the court's evidentiary ruling violated his due process right to establish a defense.

Well established principles guide our resolution of the defendant's claim. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The defendant's right to present a defense is not absolute, however; [t]he right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Tilus*, 157 Conn. App. 453, 474–75, 117 A.3d 920 (2015), appeal dismissed, 323 Conn. 784, 151 A.3d 387 (2016).

"[A] defendant's right to present a defense does not include a right to present evidence that properly is excluded under the rules of evidence. . . . The sixth amendment to the United States constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not

require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated. . . .

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The trial court has wide discretion to determine the relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [A]buse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 169 Conn. App. 343, 379–80, 150 A.3d 244 (2016), cert. denied, 324 Conn. 905,     A.3d     (2017).

In general terms, the events that transpired during the prior incident involving the defendant, Vasquez, Mark, Garcia, and a third party, were not material to an understanding of the events surrounding the victim's death. In light of certain evidence presented by the state, however, the prior incident was relevant to the jury's assessment of the state's case. When the issue was raised initially, defense counsel stressed that he wished to introduce evidence concerning the prior incident in order *to explain the source of the blood that was observed on the defendant's sneaker following the victim's death*. The court's ruling afforded the defendant a full opportunity to attribute the source of the blood to the prior incident, but it did not permit the defendant to introduce evidence that the third party was known to be a "crackhead." The defendant availed himself of this opportunity by presenting evidence with respect to many details of the prior incident, including when it occurred, what transpired, who was involved, and why the defendant acted in the violent manner that he did. The defendant presented ample evidence that he kicked the third party in the head and that this conduct, motivated by his desire to help Vasquez, was the source of the blood on his sneaker.

Throughout the trial, however, defense counsel also

made clear that the defense had a right to present evidence *to provide necessary context for the defendant's statement that he had kicked a "crackhead."* It hardly can be disputed that the state presented evidence of the defendant's highly incriminatory statement in this regard as evidence that he had kicked the victim and, thus, was criminally liable for his death. Although the defendant, through his testimony, provided context for the statement that he made to Ruiz and made clear that he had not referred to the victim, additional evidence with respect to whether the defendant and his associates referred to the third party as a "crackhead," if believed by the jury, would have made it less likely that the defendant's statement was an admission that he had kicked the victim.

" 'Relevant evidence,' " which is generally admissible, "means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. §§ 4-1, 4-2. The proffered testimony from Garcia, Vasquez, and the defendant, that the third party was a "crackhead" and that the prior incident occurred incident to a botched drug sale by Vasquez to the third party, tended to make it more likely than it would be without that evidence that the defendant's reference to having kicked a "crackhead" referred to the third party.

It is clear from a review of the court's many rulings with respect to the matter that it determined that presenting the proffered evidence would have risked confusing the issues properly before the jury and creating a factual dispute with regard to a collateral matter. We recognize that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. In light of the probative value of the evidence in terms of providing context for the defendant's incriminatory statement, we are not persuaded that its probative value would have been outweighed by a risk of confusing the jury with respect to a collateral matter or that the presentation of the evidence would have amounted to a waste of time. The court's ruling already had opened the door for the defense to elicit a great deal of testimony concerning the prior incident. In light of the other evidence, it is difficult to see how permitting evidence with respect to a few additional details concerning the alleged drug deal involving the third party and Vasquez would have unduly burdened or confused the jury in its proper evaluation of the evidence and the issues before it. Thus, we are persuaded that the court's ruling reflected an abuse of discretion. The ruling, which precluded the defendant from presenting admissible evidence to rebut an important aspect of the state's case, infringed upon

his right to present a defense.

"As with all improper evidentiary rulings of constitutional proportion, we now must consider whether the exclusion of the evidence was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citation omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 823–26, 135 A.3d 1 (2016). "An improper evidentiary ruling is subject to harmless error analysis, and if the impropriety is constitutional in nature the state has the burden of proving that the error was harmless beyond a reasonable doubt." *State* v. *Ruocco*, 151 Conn. App. 732, 751, 95 A.3d 573 (2014), aff'd, 322 Conn. 796, 144 A.3d 354 (2016).

As our foregoing discussion reflects, there were many other facts admitted into evidence concerning the prior incident and assault on the third party. Even in the absence of the proffered evidence that the defendant and his associates had referred to the third party as a "crackhead," it is highly likely that the jury would have inferred from the facts in evidence that the third party was engaged in illicit drug related activity with Vasquez. Addressing the issue directly, the defendant testified that in his statement to Ruiz, in which he referred to having kicked *a crackhead*, he was referring to *the third party* and not the victim. He went on to testify that he, in fact, had kicked the third party and not the victim. The defendant drew the very inference that he wanted the jury to draw. This testimony was bolstered by the evidence that Vasquez was in possession of crack cocaine at the time of the prior incident and that the third party had "done something to" Vasquez. Moreover, there was no evidence that the victim in the present case was a crack addict or that he owed money to anyone. In fact, the evidence suggested that the defendant and his cohorts did not know the victim, but that his murder was a tragic crime of opportunity. Against this evidentiary backdrop, we are not persuaded that the added details concerning the prior incident that the court excluded from the evidence would have affected the jury's assessment of the defendant's statement that he had kicked a "crackhead," let alone provided a tendency to influence the judgment of the jury.

In evaluating harm, we are mindful that the defendant

was afforded great latitude in exploring the prior incident and that, even absent the evidence at issue, he was able to provide a great deal of context for his statement to Ruiz. Also, we are persuaded by the strength of the state's case. The state presented ample evidence that the defendant was present at the scene of the crime and that he had an opportunity to commit the crimes at issue. The state presented evidence that the defendant confessed to his role in the crime, having admitted that he, in fact, kicked the victim in the head during Mark's assault. His incriminatory statements were bolstered by evidence from the crime scene, as well as the defendant's admission that he had blood on his sneaker following the victim's murder. Also, there was evidence that the defendant was conscious of his guilt by means of his expressions of regret for his role in the crime, cleaning his sneaker, and secreting the victim's belongings. There was evidence that his statement to the police was motivated, in part, by a desire on his part to "come clean" for his role in the victim's murder. In light of the foregoing evidence, we conclude that the court's evidentiary error was harmless beyond a reasonable doubt.

## II

Next, the defendant claims that the court violated his right to cross-examination by limiting the scope of his cross-examination of a state's witness. We disagree.

By way of factual background, we observe that the testimony of George Tirado, who was a detective with the Waterbury Police Department at the time of the events at issue, was a central part of the state's case. The state presented testimony that, on November 28, 2010, the defendant voluntarily spoke with Tirado and provided a signed written statement to him in which the defendant implicated himself in the crimes of which he was convicted. As discussed previously in this opinion, at trial, the defendant disputed the accuracy of his statement, asserting that several matters in the statement were untrue and that the statement did not completely reflect what he stated to Tirado. Also, Tirado testified about what transpired during the interview and what the defendant stated.

At the time of trial, the defense indicated that, pursuant to § 6-7 of the Connecticut Code of Evidence, it intended to impeach Tirado, who was no longer a member of the Waterbury Police Department, by means of his felony conviction on April 19, 2013, of one count of conspiracy to make false statements to the Federal Elections Commission and to defraud the United States. Also, defense counsel stated that, under § 6-6 (b) of the Connecticut Code of Evidence, the defense intended to impeach Tirado by means of two "nonconviction matters" that related to an assessment of his credibility. With respect to the first matter, defense counsel stated that it related to a scheme employed by Tirado, in his

business, by which he inflated an employee's paycheck by $500 per week and, subsequently, "received those funds in cash or nonmonies that were not disclosed on his tax return . . . ." When the court asked if this was a fact or an allegation, defense counsel stated that he had a good faith belief that it was a fact. Defense counsel stated: "The basis for my belief is that the federal government, in the investigation of Mr. Tirado, in that investigation they discerned and disclosed that Mr. Tirado had conducted himself in this activity. As an attorney, I was . . . one of the counsel for the codefendants, I have personal knowledge of the information contained therein." Defense counsel went on to state that the information was contained in a sentencing memorandum.

Defense counsel stated: "The other specific act of misconduct is contained in the same document filed by the government after the federal government did an extensive investigation." With respect to this misconduct, defense counsel stated that Tirado, who had an ownership interest in a store that sold tobacco products, had instructed an employee to dilute the tobacco product sold to customers, without notifying them, in order to reap additional profits.

The prosecutor responded that Tirado had challenged the facts set forth in the sentencing memorandum on which the defense relied. Defense counsel replied that he had reviewed that filing by Tirado, but stood by the government's allegations. Defense counsel stated that, although he had personal knowledge of certain facts, he was bound by a court order not to disclose the documents on which such knowledge was based. Defense counsel argued that the two instances of misconduct were admissible to show a lack of veracity on the part of Tirado. The court expressed its reservations about permitting inquiry on the basis of allegations and good faith beliefs, not adjudicated facts.

The court ruled that inquiry into Tirado's conviction was permitted by § 6-7 of the Connecticut Code of Evidence. With respect to the other misconduct, the court stated: "[T]he basis for [counsel's] good faith belief comes from documents and/or information that cannot be disclosed, so the court has no way of making an assessment in terms of the basis for the good faith belief. No one else is apprised of that information. . . . It seems to be analogous to the presentence investigation report that's in the state [practice], but there's a memorandum of sentencing . . . I believe the term you used was memorandum of sentencing, and contained in the memorandum of sentencing is the information concerning the pay . . . and the instructions concerning how to dilute the tobacco came from recordings or other information that cannot be disclosed." The court went on to observe that defense counsel recognized that Tirado disputed what was in the sentencing report,

but did not have a copy of Tirado's filing in this regard. The court stated that, under these circumstances, it would not permit the inquiry into the two acts of misconduct that did not result in a conviction.

During Tirado's subsequent trial testimony, defense counsel elicited that he was no longer a police officer and that he had been convicted of conspiracy to make a false statement to the Federal Elections Commission and to defraud the United States. At length, defense counsel cross-examined Tirado with respect to the events that transpired when the defendant met with him and provided a statement, as well as inquiring into whether the statement contained Tirado's version of the facts and whether it was complete. During its charge, the court drew the jury's attention to the evidence that Tirado had been convicted of a crime. The court instructed the jury that the "criminal record . . . bears only on the witness's credibility."

"The legal standards governing the review of alleged violations of a criminal defendant's sixth amendment right to cross-examine witnesses are well established. The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . Indeed, if testimony of a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to reveal any infirmities that cast doubt on the reliability of that testimony. . . .

"However, [a] defendant is . . . bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the [federal] constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . In analyzing the defendant's claims, we first review the trial court's evidentiary rulings. Our standard of review for evidentiary claims is well settled. To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *D'Amato*, 163 Conn. App. 536, 553, 137 A.3d 38, cert. denied, 321 Conn. 909, 136 A.3d 643 (2016).

"If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail. . . . If, however, we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment, including cross-examina-

tion, [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010).

"A witness may be asked, in good faith, about specific instances of conduct of the witness, if probative of the witness' character for untruthfulness." Conn. Code Evid. § 6-6 (b) (1). "The right to cross-examine a witness concerning specific acts of misconduct is limited in three distinct ways. First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the [issue] of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible. . . .

"In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . We have emphasized in numerous decisions, however, that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. . . . A defendant may elicit only relevant evidence through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Citations omitted; internal quotation marks omitted.) *State* v. *Vere C.*, 152 Conn. App. 486, 504–505, 98 A.3d 884, cert. denied, 314 Conn. 944, 102 A.3d 1116 (2014).

Here, the court's ruling to exclude the proffered inquiry was based on its determination that the defense had not made a sufficient showing to demonstrate that the prior acts of misconduct were, in fact, material in that they tended to demonstrate Tirado's character for untruthfulness. Defense counsel set forth the basis of his good faith belief; the representations made by defense counsel were based upon an unsubstantiated sentencing memorandum in an unrelated proceeding. Counsel's representations reflected that the government's allegations against Tirado had not been adjudicated to any extent, and, in fact, that they had been challenged by Tirado and, thus, were unproven. The court observed that counsel stated that, at that time, he was unable to provide the court with a complete basis for his good faith belief.[10] Thus, beyond expressing his personal belief in the accuracy of what appeared in the memorandum, defense counsel set forth indeterminate proof with respect to his belief that Tirado had

been untruthful. Such indeterminate proof was a sound basis upon which to exclude the inquiry. See *State* v. *Annulli*, 309 Conn. 482, 496, 71 A.3d 530 (2013). The defendant is unable to demonstrate that the court's evidentiary ruling reflected an abuse of discretion and, thus, his constitutional claim fails.[11]

### III

Next, the defendant claims that the court improperly instructed the jury with respect to accessorial liability in the course of its instructions concerning the murder count. The state urges us to conclude that the claim is not justiciable. We agree with the state.

"Mootness raises the issue of a court's subject matter jurisdiction and is therefore appropriately considered even when not raised by one of the parties. . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction. . . . We begin with the four part test for justiciability established in *State* v. *Nardini*, 187 Conn. 109, 445 A.2d 304 (1982). . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Heisinger* v. *Dillon*, 168 Conn. App. 467, 475–76 n.12, 147 A.3d 1123, cert. denied, 323 Conn. 940–41, 151 A.3d 387 (2016). "[J]usticiability comprises several related doctrines, namely, standing, ripeness, mootness and the political question doctrine, that implicates a court's subject matter jurisdiction and its competency to adjudicate a particular matter. . . . A case that is nonjusticiable must be dismissed for lack of subject matter jurisdiction." (Internal quotation marks omitted.) *Janulawicz* v. *Commissioner of Correction*, 310 Conn. 265, 270, 77 A.3d 113 (2013).

The defendant's claim of instructional error involves the crime of murder. Although he was charged with murder and found guilty of that crime by the jury, he does not stand convicted of that crime because the court vacated that conviction. See footnote 1 of this opinion. Accordingly, there is no actual controversy with respect to the claim, the matter is not capable of being adjudicated by this court, and a determination of

the claim will not result in any practical relief to the defendant. Accordingly, the claim is not justiciable and we must dismiss this portion of the appeal.

IV

Next, the defendant claims that the court improperly failed to comply with the jury's request to have certain testimony played back. We disagree.

The following additional facts underlie this claim.[12] During jury deliberation, the jury sent a note to the court with several questions. In responding to the jury's inquiries, the court stated: "[I]f you end up requesting testimony, indicate if it's the entire testimony, something on direct, something on cross. Just be specific. The other thing, though, would be during the playback, if whatever it is that you're discussing, you hear the answer and there isn't any need for the rest of it, I'll ask the foreperson to raise his hand . . . so that we know we've reached a point where whatever it is you needed to resolve among yourselves has been resolved." Defense counsel affirmatively stated that it did not have any objection to the court's instruction.

Later that day, the jury sent a note to the court requesting, as relevant to the present claim, playback with respect to certain subjects testified to by Garcia, Ruiz, and Vanessa Olivencia, a friend of Hernandez.[13] The jury was summoned to the courtroom. While it was listening to the playback of Ruiz' testimony, the jury indicated that it had heard enough, and the jurors signaled affirmatively when asked if "everyone [was] in agreement that you've reached a point where whatever the question you had has been answered." While it was listening to the playback of Olivencia's testimony, the jury indicated that it had heard enough. Again, when the court asked the jury if its dispute had been resolved, all jurors responded affirmatively. The record reflects that the jury heard playback of Garcia's testimony,[14] but it does not reflect that the jury stopped playback or that the court inquired with respect to that playback.

Outside of the presence of the jury, defense counsel objected that, with respect to the playback of Garcia's testimony, the jury had heard only portions of his direct examination by the state and not the defense's cross-examination. Then, the courtroom clerk indicated on the record: "As I brought the jurors back, they explained to me that they misunderstood your question, did you get what you needed. They got what they wanted from the direct portion on that issue, but they did want to hear the cross-examination." The clerk stated that he instructed the jurors to convey their concerns to the court in a written note. Later that day, the jury sent a note to the court stating: "Can we make sure we hear direct and cross for each item." The court had the courtroom clerk seek clarification from the jury, and the court stated that the jurors had expressed their desire

to continue deliberations, that they did not wish to hear further playback, and that they would send out a note if anything was required. Before the court dismissed the jury at the end of the day, the court, referring to the earlier playback request, informed the jury that it would be ready to play back the "remaining areas that we didn't reach," and that the jury should "just let us know" if and when it wanted to hear the playback the next day.

The following morning, the jury resumed its deliberations. The jury sent a note to the court unrelated to its earlier playback request. The court asked the parties if they had resolved any issues with respect to locating the playback requested the day prior, and the parties agreed that this was now ready to be played for the jury, as the court stated, "in the event they request it again." Later, defense counsel objected to the way that the court addressed the jury's request for playback the prior day. Defense counsel stated that the court had played only the direct examination testimonies of Garcia and Ruiz. Defense counsel argued that "no matter what," the jury should be required to hear the remainder of their testimony.

The court responded: "When the jurors came out, I indicated to them that you two had agreed on identifying what you believed were the portions in the transcript that applied. I also indicated that if whatever it is that they [wanted] hadn't been resolved, if when they hear the playback, if they got the answer they could indicate such. There were certain points at which the foreperson raised his hand, indicated they got what they were looking for. I inquired of all the jurors and they indicated they agreed.

"At the end of all of that, you did put on the record that what was read . . . was the direct and redirect and not the cross, that was then agreed to. And I indicated to you that if they do request that they still need to have the information from that note, then we will address it. We were here after I discharged them yesterday, I went through the listing of the areas where that may be the issue. There was an agreement as to those places, because whether or not you're aware of it, there are times when jurors have sent out a note and request something, and before we could even get it set up, they have said never mind.

"So I would not assume what you have assumed, because they said they've resumed. When I had the clerk inquire, given the note indicating that they misunderstood my question, and that they were asking for direct and cross. But I also had the clerk inquire and they said they want to continue working. So as it stands now, I will not treat it any differently than any note where there's been a request, and then the jurors have continued deliberating, and they make a decision as to whether or not they still need that information. We've

identified it in the event that they do, and then we'll take it from there, if they indicate that they actually do need to revisit it." After defense counsel disagreed with the court's statement that the parties had reached an agreement with respect to matters that were played back for the jury a day earlier, the court reiterated that the jurors "will be the ones to determine whether or not they're confused and whether or not they have any request concerning the initial request [for playback]."

The record reflects that the jury did not request further playback. The jury sent the court a note that stated: "Based on the judge's question, at this time we do not need to hear the additional testimony that we requested yesterday."

The defendant raised the issue once more among several grounds raised in his motion for a new trial. Defense counsel's argument focused on what it perceived to be both unfairness in presenting only examination by the state as well as unreasonable delay in locating requested playback. Defense counsel stated that the jury had been "tainted" because it had not heard the cross-examination testimony. In rejecting the claim, the court stated: "So if I understand your argument then, what was improper was [that the jury] made a request and during the time that it took to identify where the information was to accommodate the request, that somehow [the jury] shouldn't have been allowed to continue deliberating or somebody should have said something to [the jury] about the time that it was taking to locate [the requested playback]. And then I did indicate to [the jurors] to alert the court when they had the information they needed, and my recollection is that during the initial playbacks they did . . . when we had reached what they needed. They did do so. And then the next day I indicated, given the second request, that we had then located the remainder, and they could then let the court know if they still needed it, and they said they didn't."[15] Defense counsel argued that the jury appeared to be "bewilder[ed]" by what had transpired, but the court stated that it interpreted the jury's conduct as an indication that it no longer needed to hear additional playback.

As he did before the trial court, the defendant argues that the court "abused its discretion in the manner it allowed the evidentiary read backs to occur" in that it failed to provide the jury with the playback it requested, presented the jury with a "skewed" playback of testimony, and "did nothing to act in a more expeditious manner to try and rectify the problem that it had created."

Practice Book § 42-26 provides: "If the jury after retiring for deliberations requests a review of certain testimony, the jury shall be conducted to the courtroom. Whenever the jury's request is reasonable, the judicial authority, after notice to and consultation with the pros-

ecuting authority and counsel for the defense, shall have the requested parts of the testimony read to the jury."[16] "[T]he trial court has discretion to grant a jury's request to review testimony. . . . What portions of the record, if any, will be submitted to the jury for [its] consideration is a matter of sound judicial discretion. . . . In determining whether the trial court has abused its discretion, the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness . . . . [T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Cancel*, 275 Conn. 1, 11–12, 878 A.2d 1103 (2005).

A somewhat similar claim was raised and rejected by our Supreme Court in *State* v. *Rivera*, 223 Conn. 41, 612 A.2d 749 (1992).[17] In *Rivera*, the defendant claimed "that it was unreasonable as a matter of law for the jury to request, and the court to order, a replay of [a witness'] direct examination but not her cross-examination. He further argues that once the jury requested to rehear [another witness'] testimony, the trial court was obligated to replay her cross-examination, despite the jury's withdrawal of its request prior to rehearing any of her testimony." Id., 48. In rejecting the claim, the Supreme Court concluded "that the trial court acted within its discretion when it allowed the jury to rehear only that testimony that the jury indicated that it wished to rehear. We cannot conclude, as the defendant seems to advocate, that the trial court was required as a matter of law to replay more of the witnesses' testimony than the jury believed it needed to rehear in order to reach a verdict." Id.; see also *State* v. *Harris*, 227 Conn. 751, 771, 631 A.2d 309 (1993) ("[u]nless the court was convinced that an injustice would result, it was not, despite any agreement, required to force the jury to listen to what it did not want to hear").

Here, the judge explained the reason for any delay in responding to the jury's requests for playback. We observe that the jury's initial request related to several subject matters and the testimony of several witnesses. It appears that any delay was incident to the court complying with the dictate of Practice Book § 42-26 to respond to the playback request "after notice to and consultation with the prosecuting authority and counsel for the defense . . . ."

In its initial instructions concerning playback, the court instructed the jury to be specific in its request for playback. It appears from the record that, at least with respect to the playback of the testimony of Ruiz and Olivencia, the court stopped the playback when, on the basis of the jury's communications, it believed that the jury did not want additional playback. The

record does not reflect that such communication occurred with respect to the playback of Garcia's testimony.

When the court learned that the jury wished to hear cross-examination testimony for these witnesses, it immediately asked counsel to locate the portions of the testimony at issue. Once these portions were identified, the court communicated to the jury that it would continue the playback at the jury's request. Thereafter, the court learned that the jury wished to continue in its deliberations. The court learned this through the jury's communications with the courtroom clerk as well as the jury's note indicating that it had determined that the additional playback was not necessary.

There may have been a miscommunication between the jury and the court with respect to the jury's initial request for playback. This appears to have been compounded by the jury's conduct in stopping playback, as it had been instructed to do when it believed that further playback was no longer necessary. There is no indication, however, that the court attempted to disregard the jury's request or that it did not take immediate steps to present the jury with what had been requested. Such circumstances do not give rise to a claim of unfairness. Moreover, before the jury reached its verdict, the court communicated to the jury that it was ready to provide additional playback. When the jury stated that it was not necessary, the court, in its discretion, properly viewed the matter as an abandoned request for playback. We are not persuaded that the court acted in abuse of its discretion by failing to compel the jury to listen to the additional playback in light of the jury's unambiguous communication that it did not need to consider such playback, nor do the circumstances lead us to conclude that an injustice resulted. Although the defendant urges us to conclude that the court acted unfairly, the record does not remotely suggest that the court attempted to thwart the jury's initial request. It appears that the court complied with our rules of practice with respect to playback. Accordingly, we reject the defendant's claim.

V

Finally, the defendant claims that the court improperly denied his request to suppress a written statement that he provided to the police.[18] We disagree.

Prior to the commencement of the trial, the defendant moved to suppress all oral and written statements concerning the present case that he had provided to the Waterbury Police Department. The defendant argued, inter alia, that his statements were provided without the assistance of counsel during a custodial interrogation by the police, and that he was not advised of, did not understand, and did not waive his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602,

16 L. Ed. 2d 694 (1966). He argued that any *Miranda* advisement or claimed waiver occurred after his interrogation. Moreover, the defendant argued that his statements were not knowingly and voluntarily made, but that any statements were the result of violent threats made by Tirado. In opposition to the motion, the state argued that the defendant was not in police custody at the time that he provided his statements and that he knowingly and voluntarily waived his *Miranda* rights before making them.

The court held a hearing on the motion to suppress during which it heard testimony from Tirado, Christopher Corbett, and David McKnight, all of whom were officers with the Waterbury Police Department. The court also heard testimony from the defendant and Bernard Barile, a psychologist who had examined the defendant.

In its memorandum of decision denying the motion to suppress, the court found the following facts: "[The victim] was killed on November 2, 2010. The defendant's name came up during the investigation and Detective Tirado went to a residence on Thanksgiving as he wanted to talk to him. The defendant was not there so Detective Tirado left his card with his name and phone number.

"The defendant called Detective Tirado on Friday, the day after Thanksgiving, and again on Saturday because he wanted to meet with Detective Tirado and explain his version of events. On Sunday, November 28, 2010, the defendant went to the police department at approximately 9 a.m., accompanied by his aunt and uncle. He called Detective Tirado, who was at home, to let him know he was at the police department.

"Shortly before 11 a.m., Detective Tirado called Captain Corbett to come to the police department, since Captain Corbett was supervising the investigation. Detective Tirado also called Detective [Steve] Jeanetty and asked him to take the defendant to an interview room. Detective Tirado arrived at the police department close to 11 a.m., and Captain Corbett arrived at approximately 12 noon.

"Detective Tirado entered the interview room, introduced himself, and informed the defendant that he would be talking to him about the night [the victim] was killed. Detective Tirado then left the room and retrieved the [*Miranda*] rights cards. He asked the defendant if he wanted anything and the defendant said he was all set. Detective Tirado advised the defendant of his *Miranda* rights at 11:10 a.m.

"The defendant was eager to talk to Detective Tirado because he wanted to help solve the case. He believed his version of the events of November 2, 2010, would show his involvement and identify [Mark] as the person who killed [the victim].

"During the time at the police station, the defendant was not handcuffed or placed in any restraints. Detective Tirado left the room three times and each time the door was left open and no one else entered the room. Detective McKnight, Detective Jeanetty, Captain Corbett, and Lieutenant [Frank Capozzi] were also present in the detective bureau. Detective McKnight and Captain Corbett were in their offices and did not hear any yelling or arguing from the interview room. Furthermore, Detective Tirado was not armed.

"Prior to giving his version of events, the defendant disclosed that he had completed the 11th grade, he could read and write, and he communicated in English. Detective Tirado had him read the rights form out loud and he said he understood them.

"Detective Tirado then asked what happened and the defendant gave his version of what he did and what Mark did on November 2, 2010. Detective Tirado had the defendant explain and offer details. After approximately one hour, the defendant agreed to give a written statement.

"At 12:01 p.m., prior to typing the statement, Detective Tirado again advised the defendant and he again waived his rights. Detective Tirado then proceeded with the typed statement. Detective Tirado stated that he had the defendant read the statement and he had nothing to add or to change so he got Captain Corbett and Detective McKnight to notarize and witness the defendant's signature.

"Captain Corbett had the defendant read a portion of the statement. He stopped him when he was comfortable [that] the defendant could read, and had him initial and sign it. Detective McKnight then signed as a witness. Detective McKnight said he heard the defendant read [aloud] without any problems. He did not stumble.

"At the time of the interrogation, Detective Tirado did not know the details of the killing until the defendant provided them. The codefendant [Mark] had not yet been interviewed. The defendant provided the information that implicated him in the death of [the victim]. The officers secured an arrest warrant and the defendant was placed under arrest.

"Captain Corbett and Detective Tirado described the defendant as well groomed, appropriately dressed, and calm. No one detected any odor of alcohol and the defendant said he had not taken any drugs.

"While at the police department, the defendant did not ask for a lawyer and he didn't refuse to answer any questions. To the contrary, he wanted to tell his version of events because he believed he was identifying the killer and he would not be held responsible for the death [of the victim].

"The defendant's version of what happened at the

police department differs significantly from that of the three officers who testified. He agrees he went there voluntarily with his aunt and uncle to tell his version of events, and he waited two hours for Detective Tirado. He stated Detective Tirado took him to the interview room, not Detective Jeanetty. He agreed Detective Tirado did leave the room and left the door open. He also stated Detective Tirado was calm at first, then became frustrated, threatened to slap him, called him a liar, and moved his chair so close to him [that] their knees touched.

"The defendant also said [that] while Tirado was in the room he tried to leave, and Tirado told him to sit and threatened to get Detective McKnight to keep him in the room. However, there was no attempt to leave when Tirado left the room with the door open. The defendant said he was a pretty big guy at the time and he was much bigger than Detective Tirado. He also stated [that] Detective Tirado took him out of the room to a larger computer room and had him look at Google Maps and photos of the deceased. Detective Tirado testified [that] there is no need to take anyone out of the room to look at Google Maps, as he can do so on the computer in the room.

"Detective McKnight, who was working at his desk in the hallway outside the interview room, never saw the defendant leave the room, but he did see Detective Tirado come out a couple of times. The defendant described the room and the location of a TV set he saw. However, Detective McKnight stated the defendant could not have seen a TV set because the view is blocked by a pillar/columns in the center of the room.

"Additionally, the defendant denied reading both rights forms, initialing the forms and the statement, but he did acknowledge his signature on each. Furthermore, he stated [that] he signed all three at the same time at the end of the statement. First he said he didn't read it, then he said Detective Tirado read it to him, and he also said he never saw Detective McKnight or Captain Corbett in the interview room.

"To credit the defendant's version of events would require the court to discredit the testimony of Detective Tirado, Detective McKnight, and Captain Corbett." (Footnotes omitted.) The court went on to make findings with respect to Barile, who examined the defendant. Ultimately, the court found in relevant part: "The testimony of Dr. Barile shows that any limitations the defendant may have had [in terms of his intellectual capacity] did not prevent him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights."

After setting forth applicable law, the court concluded that the defendant was not in police custody. In relevant part, the court stated: "In this case, on Thanksgiving day, the defendant was informed by fam-

ily members that Detective Tirado wanted to talk to him. The next day, Friday, and again on Saturday, the defendant contacted Detective Tirado to try to meet with him. On Sunday, he went to the police department, accompanied by his aunt and uncle. He again called Detective Tirado and waited two hours for his arrival at the station. Detective Jeanetty took the defendant to an interview room to wait for Detective Tirado.

"When Detective Tirado arrived in the interview room, he introduced himself and explained [that] officers had talked to several other people and [that] they were looking for his side of the story, his version of events the night [the victim] was killed. Detective Tirado then left the room and got the rights card and waiver form.

"The defendant was not placed in handcuffs or any other restraints. Detective Tirado was unarmed and . . . McKnight and Corbett were engrossed in their work outside [of] the interview room. They did not enter until needed to notarize and witness the defendant's signature, and there is no evidence either was armed. The defendant's aunt and uncle were in the police department and the defendant was free to leave if he wanted to do so. Furthermore, he had been advised he could stop answering questions at any time.

"The defendant gave an oral statement and then consented to give a written statement. He was again advised prior to the written statement. The defendant was eager to talk as he believed his version of events would identify [that] the codefendant [Mark] was the person who killed [the victim].

"Under the totality of these circumstances, the defendant was not in custody."

The court went on to conclude that, even if the defendant made his statement to the police while in police custody, the police had administered *Miranda* warnings and the defendant had waived his rights prior to the time that he was questioned. In relevant part, the court found: "At the time the defendant gave the statement, he was twenty-five years old and had completed the 11th grade. He said in the statement that he had four children and at the hearing he stated [that] he had six. He said he read the statement, didn't read the statement, and Detective Tirado read the statement to him.

"Detective Tirado gave the *Miranda* warnings shortly after meeting the defendant as they both knew why he was there. The defendant acknowledged [that] he has a larceny conviction and had been arrested and booked a number of times in New York. Tirado had no difficulty communicating with the defendant and the defendant knew what was going on. He could read and understand English and his fifth grade teacher taught him to read and gave him tricks to help with reading and compre-

hension. He expressed [that] he wanted to help find the person who killed [the victim]. Detective Tirado was unarmed and no one threatened the defendant or made any promises to him. Furthermore, he was not under the influence of alcohol or other drugs, or on any medication. What the defendant described as threats was not credible.

"Dr. Barile's testimony established [that] the defendant's IQ was in the 80's and the normal range is 90-100. However, Dr. Barile also stated [that] he read the [*Miranda*] warnings to the defendant, and he seemed to understand them and the waiver of rights form. The defendant did not have problems with reading or writing English. Dr. Barile acknowledged this was his first evaluation of this type, but also concluded [that] the defendant was not susceptible or open to influence, had a defensively narcissistic personality, and an attitude of entitlement. Although the defendant said he had a head injury, there was no evidence to support that claim.

"The state has proved by a preponderance of the evidence [that] the defendant voluntarily, knowingly, and intelligently waived his right to remain silent."

On appeal, the defendant challenges the court's conclusion that he was not in police custody at the time that he made his statement to the police.[19] Also, the defendant challenges the court's conclusion that his statement was knowingly and voluntarily made. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

"Normally, [w]hen a suspect is taken into custody, the *Miranda* warnings must be given before any interrogation takes place. . . . The primary purpose of the *Miranda* warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . The defendant bears the burden of proving custodial interrogation." (Internal quotation marks omitted.) *State* v. *Smith*, 321 Conn. 278, 288, 138 A.3d 223 (2016). The record reflects, and the state acknowledges, that the defendant was subjected to police interrogation.

"In order to establish that he was entitled to *Miranda*

warnings, a defendant must show that he was in custody when he made the statements and that he made the statements in response to police questioning. . . . In assessing whether a person is in custody for purposes of *Miranda*, the ultimate inquiry is whether a reasonable person in the defendant's position would believe that there was a restraint on [his] freedom of movement of the degree associated with a formal arrest. . . . Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address. . . .

"[We have] set forth the following nonexclusive list of factors to be considered in determining whether a suspect was in custody for purposes of *Miranda*: (1) the nature, extent and duration of the questioning; (2) whether the suspect was handcuffed or otherwise physically restrained; (3) whether officers explained that the suspect was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the suspect was isolated from friends, family and the public." (Citations omitted; internal quotation marks omitted.) *State* v. *Arias*, 322 Conn. 170, 177, 140 A.3d 200 (2016).

In his challenge to the court's conclusion with respect to custody, the defendant appears to rely merely on his own version of what transpired during the police interrogation. The defendant maintains that Tirado not only threatened him but prevented him from leaving the interrogation room. The court, however, found the defendant's version of events not to be credible. The defendant "encourages [this] court to review the transcript to make its own determination of the reliability of the witnesses, [and] in doing so, bear in mind that Tirado was the only person convicted of a felony at the time of their testimony."

The defendant has not demonstrated that the court's findings of fact are clearly erroneous on the basis of the evidence and pleadings in the whole record. The court's findings with respect to what transpired during the interrogation are supported by the testimony of the police officers. To the extent that the defendant invites us to reevaluate the credibility determination that was central to the court's decision, we decline to do so. "On a motion to suppress, [i]t is the function of the trier to determine the credibility of witnesses and the weight to be given their testimony." (Internal quotation marks omitted.) *State* v. *Douros*, 90 Conn. App. 548, 554, 878 A.2d 399, cert. denied, 276 Conn. 914, 888 A.2d 85 (2005).

To the extent that the defendant also challenges the court's denial of his motion to suppress on the ground

that his statement was not voluntary, as he did at trial, we observe that the court did not expressly address this claim in its decision. Instead, the court concluded that the defendant was not in custody and that he had voluntarily waived his *Miranda* rights. Nonetheless, we may dispose of the voluntariness claim on the ground that the arguments in support of it reflect that it merely is an invitation for this court to reevaluate the credibility determinations made by the trial court with respect to his testimony as well as that of the police officers who testified at the suppression hearing. Among other arguments, the defendant refers to portions of the officers' testimony, which he deems to be contradictory, in an attempt to demonstrate that the officers did not testify truthfully. Additionally, the defendant urges us to interpret Barile's testimony to require a finding that he had "significant intellectual limitations" that left him unable to voluntarily make a statement after being "interrogated for nearly four hours by a hostile Tirado, who was willing to threaten [him] to stop him from leaving."

"The standard for voluntariness of a *Miranda* waiver is the same as the standard for voluntariness of a confession. . . . Irrespective of *Miranda* . . . any use in a criminal trial of an involuntary confession is a denial of due process of law. . . . In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . Furthermore, the scope of review is plenary on the ultimate question of voluntariness, but the trial court's findings regarding the circumstances surrounding the defendant's questioning and confession are findings of fact that will not be overturned unless they are clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Azukas*, 278 Conn. 267, 289–90, 897 A.2d 554 (2006).

The court's findings with respect to the defendant's *Miranda* waiver, therefore, are relevant to the present claim with respect to the voluntariness of the confession. The court made clear findings that the police interview was not coercive. The defendant's will was not overborne. Instead, motivated by a desire to implicate Mark in the victim's murder, he knowingly and voluntarily sought Tirado for the purpose of making the statement that he did. The court found that the defendant traveled to Connecticut to meet with Tirado, having called him multiple times. The court found that the defendant was calm and responsive to questioning, and did not make any attempt to stop the interview. The court found that the defendant, who read, spoke, and understood English, was compliant in reviewing the written statement and in signing it before a witness and a notary. Put otherwise, the court plainly rejected the

defendant's testimony that coercion or threats had played a role in his confession. Moreover, the record reflects that the court carefully considered Barile's testimony and reasonably found that the defendant did not have an intellectual disability that impaired his ability to voluntarily make a statement to the police. The defendant has not undermined our confidence in the correctness of the court's findings, which are amply supported by the testimony of the police officers. On the basis of those findings, we conclude that the defendant's confession was freely and voluntarily made.[20]

The appeal is dismissed with respect to the defendant's claim that the jury was improperly instructed as to the murder count; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Additionally, the jury found the defendant guilty of murder in violation of General Statutes (Rev. to 2010) § 53a-54a (a). At the time of sentencing, the court, pursuant to *State* v. *Miranda*, 145 Conn. App. 494, 508, 75 A.3d 742 (2013) (vacatur is proper remedy for double jeopardy violation caused by cumulative homicide convictions arising from killing of single victim), aff'd, 317 Conn. 741, 753–54, 120 A.3d 490 (2015), reasoned that it could not properly impose a sentence with respect to the murder and felony murder counts under which the defendant was found guilty. Accordingly, the court vacated the defendant's conviction of murder. With respect to the remaining counts, the court imposed a total effective sentence of fifty years imprisonment, with a mandatory sentence of twenty-five years.

[2] In addition to other evidence of the defendant's criminal liability, the state presented evidence that, on November 28, 2010, the defendant voluntarily provided an incriminatory statement to the Waterbury Police Department. Therein, the defendant admitted that he and an accomplice, Michael Mark, pursued the victim for the purpose of robbing him, Mark struck the victim in the head with a rock, the defendant "stomped on the [victim's] head," and Mark left the scene in possession of items taken from the victim, who remained motionless on the ground following the attack.

[3] In a separate trial, Mark was found guilty of murder, felony murder, two counts of robbery in the first degree, conspiracy to commit robbery in the first degree, and tampering with evidence. See *State* v. *Mark*, 170 Conn. App. 241, 245, 247, A.3d , cert. denied, Conn. , A.3d (2017).

[4] With respect to his comments concerning the victim, there was evidence that Mark stated, "I'm gonna rob that nigga," and that he "was going to rob his ass." (Internal quotation marks omitted.)

[5] Later, Vasquez drove Mark, Vanessa Vasquez and Sonia Hernandez to the crime scene because Mark, believing that "it would be evidence," wanted to locate and hide the hard object that he used to kill the victim. At the scene, Mark exited the automobile for the purpose of locating and hiding the object at issue. Hernandez, upon observing the victim, became upset and started screaming and crying.

[6] Earlier, at a suppression hearing in this case related to the admissibility of the defendant's statement to the police, the defendant testified in relevant part that, prior to the incident involving the victim on Baldwin Street, he was involved in a physical altercation with a third party who had taken drugs from Vasquez without paying for them. The defendant referred to the third party as a "crackhead" and stated that, during the altercation that also involved Vasquez, Mark, and Garcia, he had kicked this third party in the head.

[7] The state presented a signed, written statement that the defendant provided to the Waterbury Police Department several weeks following the events at issue. The events described in the statement differed in several respects from the defendant's trial testimony. The defendant explained these differences by denying that he made certain statements that appeared in the written statement or by stating that other statements that he did make did not appear in the statement. In particular, the defendant testified that, contrary to what appeared in the statement, he told the police that the blood

on his sneaker resulted from the prior incident on Second Avenue. Moreover, contrary to what appeared in the statement, the defendant denied that he ever stated that he had kicked the victim.

The statement reflects that the defendant told the police that he voluntarily followed Mark's invitation to rob the victim because he had robbed people in the past and did not "think much of it." The statement reflects that Mark struck the victim with a rock before ransacking him. The defendant stated that he observed the victim lying motionless on the ground while Mark was striking him in the head. The defendant stated that he "stomped on the dude's head. I only did that one time. I know he was down already, but it was just a normal reaction." He thought that Mark "was an asshole for hitting [the victim] like that with the rock." The statement reflected that, after the four men left the scene, they went to the residence on Second Avenue. At that time, the defendant was asked about blood on his white Nike sneakers. He stated that he cleaned his sneakers in the bathroom.

[8] The evidence concerning the alleged prior incident was a subject of the parties' closing arguments. As relevant to our discussion of this claim, we note that during the state's principal closing argument, the prosecutor referred to the defendant's written statement to the police, in which he stated that he had kicked the victim in the head and later had cleaned blood from his sneaker. Additionally, the prosecutor referred to the evidence that, following the victim's murder, the defendant stated to Ruiz that "he kicked the crackhead in the head."

During the defense's closing argument, defense counsel drew the jury's attention to the testimony concerning the alleged prior incident. Defense counsel referred to the defendant's testimony that, after he kicked the third party, he saw blood and then left the scene. In relevant part, defense counsel stated: "[Vasquez], when he mentions kicking . . . testified [that] it's possible that [the blood on the defendant's sneaker] came from that incident. [Garcia] testified, it's possible [that] the blood on that sneaker came from that incident. [The defendant] told you unequivocally that's exactly where the blood came from in that incident." Defense counsel directly addressed the state's argument that any references made by the defendant to having kicked "a crackhead" referred to the prior incident and not the victim. Defense counsel referred to the fact that there was evidence that the victim did not have "crack in his system." Defense counsel stated: "That we do know is that the prior incident involved something that [Vasquez] did wrong. It involved something that [Vasquez] had a problem with that guy. It involved a guy who had crack cocaine on him, Manuel Vasquez. [The defendant] told you, when I said I kicked a crackhead, it was the first guy. He came and he showed you how he kicked the guy, the first guy, the one he said was a crackhead. That's the statement from Joan Ruiz. That's the only statement that anybody talks about at Second Avenue that [the defendant] makes." Apparently suggesting that it was inconsistent with a finding that the defendant had kicked the victim, defense counsel went on to draw the jury's attention to Ruiz' testimony that there was blood on only the side of the defendant's sneaker.

During the state's rebuttal argument, the prosecutor referred to Garcia's testimony that the defendant told Ruiz "that he had kicked a crackhead in the head." Additionally, the prosecutor referred to Ruiz' testimony that, following the murder, Mark told her "that they had killed a crackhead and took his backpack."

[9] The state argues that this court should decline to review the defendant's claim because it is inadequately briefed. In support of this argument, the state asserts that the defendant has violated Practice Book § 67-4 (d) (3) by failing to include in his brief the *complete* factual and procedural history underlying the claim, which included numerous discussions between the court and counsel, as well as rulings made by the court. We agree with the state that the defendant failed to provide this court with a complete explication of the relevant arguments and rulings that were made at trial, a failure that certainly was highlighted by the completeness of the state's brief. Despite this deficiency with respect to the presentation of the appeal, the defendant's brief included enough of a recitation and discussion of the underlying facts and references to the record that we are able adequately to ascertain the nature of the defendant's claim and the rulings on which it is based. Accordingly, we will review the claim.

[10] It does not appear that counsel, at a later time, attempted to provide additional support for his belief.

[11] The defendant argues that the court's error in restricting his cross-examination of Tirado "was further compounded when the court allowed

the [state] to solicit improper information regarding the defendant without a good faith basis or without a proper legal basis." Beyond observing that the defendant has not provided any analysis for his claim of "compounded" error, we observe that, because the defendant has not adequately presented to this court any claim of error with respect to a ruling permitting the state to inquire with respect to specific instances of misconduct involving the defendant, such a claim is not before us. See Practice Book § 67-4.

[12] The state urges us to decline to review this claim on the ground that the defendant has not adequately briefed the claim. The state argues that the defendant's recitation of facts in support of the claim does not satisfy Practice Book § 67-4 (d) (5), that the defendant did not separately identify and analyze the claim in compliance with Practice Book § 67-4 (d), but incorporated his discussion and analysis of this claim with the claim we addressed in part III of this opinion, and that the claim is inadequately analyzed because the analysis does not surpass abstract assertion.

The defendant's recitation of necessary facts and citations to the record is not as complete as that provided by the state, and, inexplicably, the defendant has intertwined this claim with the unrelated claim of instructional error that we addressed in part III of this opinion. Making matters even more confusing, the "Statement of the Issues" set forth in the defendant's brief does not refer either to his third claim or the present claim, but to a prosecutorial impropriety claim that is not part of this appeal. Nonetheless, from the defendant's statement of the joint claim set forth in the table of contents and in the body of the defendant's brief, we are sufficiently able to identify that the claim has been made. From the factual basis recited, which, we observe for the second time in this opinion, is not as complete as that provided by the state, we are able to discern the factual basis of the claim. Also, guided by section headings in the brief, we are able to identify those portions of the brief in which this claim is analyzed. Although the analysis of the claim is conclusory in nature, it nevertheless includes the defendant's view of the relevant events that transpired at trial, and it includes a standard of review and a discussion of case law that the defendant believes is persuasive. Although the analysis of this claim does not exemplify the spirit of our rules of practice, in light of the foregoing, we will reach the merits of the claim.

[13] The jury's note in the present case is not entirely clear, an observation which helps to explain any miscommunication between the jury and the court with respect to playback. With respect to the witnesses at issue, the note describes topics concerning which the jury wished to hear playback. It appears that, with respect to the playback of the testimonies of Garcia and Olivencia, the jury did not specify whether it desired playback of direct examination, cross-examination, or both. With respect to Ruiz' testimony, the jury set forth the topics concerning which it wished to hear playback and, nearby, wrote "entire testimony."

[14] The jury note requested playback with respect to "what [Garcia] saw from the time they parked until they get back to 2nd Ave[nue] [and] the kitchen," testimony from Garcia about the "Time Frame" of the "First Fight," and testimony from Garcia about "going through the bag."

[15] With respect to defense counsel's argument that the court's response to the jury's request for playback was not sufficiently prompt, the court recognized that there had been a delay in responding to the various requests by the jury because it "got each [of the attorneys] involved" in identifying what had been requested and there was a disagreement concerning what was necessary. The court stated that "it took a little time to reach an agreement as to where in the testimony you agreed that that's what the jurors happened to be requesting."

[16] In *State* v. *Gould*, 241 Conn. 1, 12, 695 A.2d 1022 (1997), our Supreme Court stated that Practice Book § 42-26 "generally provides for the rereading of testimony in open court under circumstances . . . in which the court reporter must read back trial testimony from stenographic notes or locate and play back a recorded voice tape of such testimony on a tape player."

[17] We recognize that, in contrast with the jury's request for playback in the present case, in *Rivera* the jury explicitly requested playback of only the witness' direct examination. *State* v. *Rivera*, supra, 223 Conn. 48; see also footnote 13 of this opinion.

[18] The state argues, and we agree, that the defendant's appellate claim appears to pertain solely to the admissibility of his written confession. Beyond discussing the circumstances surrounding the making of his written statement, the defendant does not analyze any statements that he made orally to Tirado, or Tirado's testimony with respect to such oral statements.

Nonetheless, we observe that our analysis with respect to the issues of custody and the voluntariness of the defendant's confession apply with equal force to the admissibility of the written confession and any related oral statements made by the defendant during his police interview.

[19] We will resolve the defendant's challenge to the court's conclusion with respect to custody mindful that, even if the defendant could prevail with respect to this conclusion, he would not necessarily be entitled to relief. In this appeal, the defendant has not adequately raised a claim with respect to the court's conclusion that he waived his *Miranda* rights before he gave his written statement to the police.

[20] Having resolved the merits of the defendant's claim, we observe that, even if we were we to conclude that the court was required to suppress the defendant's written statement to the police, we would not overturn the judgment from which he appeals. This is because, to a large extent, the written statement was cumulative of other evidence that is not challenged in this appeal, specifically, Tirado's testimony that the defendant made many incriminatory *verbal* statements to him during his interrogation, including that he "stomp[ed] on the victim's head" when he came upon Mark striking the victim with a rock. See footnote 17 of this opinion.

———————————————————